UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                    :

GREENLIGHT REINSURANCE,          :
LTD., et al.,                         :
                        Plaintiffs,   :          12 Civ. 8544 (JPO)
                                    :

             -v-                   :         OPINION AND ORDER
                                    :

APPALACHIAN UNDERWRITERS,   :
INC., et al.,                       :
                       Defendants.  :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

       Plaintiffs Greenlight Reinsurance, Ltd. ("Greenlight") and Verdant Holdings Company,

Ltd. ("Verdant"), bring this action for breach of contract and declaratory judgment against

Defendants Appalachian Underwriters, Inc. ("AUI") and Insurance Services Group, Inc. ("ISG").

Before the Court is Defendants' motion to dismiss the Complaint pursuant to Federal Rules of

Civil Procedure 12(b)(1) and 12(b)(6). For the reasons that follow, Defendants' motion is

granted in part and denied in part.

## I.    Background

### A.    Factual Background[1]

       The claims in this case arise from several contracts, which overlap in various ways and

involve several iterations of the same, or related, parties. These contracts can be grouped into

three primary sets: the Reinsurance Agreements; the Retrocession Agreements; and the

Guarantees. Each of these categories is described in turn.

---

[1] Unless otherwise noted, the facts are taken from the Complaint (Complaint, Dkt. No. 1
("Compl."), and documents incorporated therein, and, for purposes of a motion to dismiss, are
presumed true.

### 1.      The Reinsurance Contracts

Defendant AUI is a managing general agent ("MGA") within the insurance sector, meaning that AUI manages all aspects of insurance underwriting for designated policies.  AUI acts as a MGA for State National Insurance Co., Inc. and United Specialty Insurance Co. (together, "the Insurance Companies" or "the Companies").  As a general rule, once AUI, as the MGA, binds policies for the Insurance Companies, they have assumed risk for the insured's loss. In order to reduce their exposure to risk, the Insurance Companies entered into three reinsurance contracts with Plaintiff Greenlight, by which the reinsurer—Greenlight—assumed some of the Companies' risk, in exchange for the transfer of a share of the Companies' premium payments received from policyholders, less the commission paid to the MGA.

At issue here are three reinsurance contracts that the Insurance Companies entered into with Greenlight: (1) the Quota Share Reinsurance Agreement, among the Insurance Companies, Greenlight, and AUI, effective July 1, 2008 (Compl., Ex. A); (2) the Quota Share Reinsurance Agreement among the Insurance Companies, Greenlight, and AUI, effective July 1, 2010 (*id.*, Ex. B); and (3) the California Quota Share Reinsurance Agreement among United Specialty Insurance Co., Greenlight, and AUI, effective July 1, 2010 (*id.*, Ex. C) (collectively, "the Reinsurance Agreements").   AUI acted as the MGA for each of these agreements.

Pursuant to § 2.03 of the Reinsurance Agreements, the Companies were required to cede part of their premiums from policyholders to Greenlight as reinsurer.[2]  In turn, § 6.03 of the

---

[2] Section 2.03 of each of the three Reinsurance Agreements reads as follows:

> The liability of the Reinsurer shall commence obligatorily and simultaneously with that of the Company [referring to the Insurance Companies] as soon as the Company becomes liable, and the premium on account of such liability shall be credited to the Reinsurer from the original date of the Company's liability.

Reinsurance Agreements requires AUI to remit to Greenlight these ceded premiums, less any

commissions to which AUI itself is entitled, providing as follows:

> Within thirty (30) days after the end of each month, the General Agent [referring to AUI][3] shall remit to the Reinsurer [referring to Greenlight] the following:
>
> (a) Ceded Collected Premiums, less;
> (b) General Agent's commission thereon, less;
> (c) Paid losses less;
> (d) Paid Loss Adjustment Expenses.
>
> The positive balance of (a) less (b) less (c) less (d) shall be remitted by the General Agent with its report.  Any balance shown to be due the Company [referring to the Insurance Companies] shall be remitted by the Reinsurer as promptly as possible after receipt and verification of the General Agent's report.

(Compl., Exs. A-C, §§ 6.03.)  Article 8 of these agreements addresses the calculation of AUI's

commission, which it subtracted from the premiums it remitted to Greenlight pursuant to the

contractual language.  Because the extent of losses under insurance policies changes over time,

§ 8.05 provides for so-called provisional commissions, which AUI was permitted to take up

front—"before the extent of losses on the underlying insurance program [was] actually known."

(Plaintiff's Memorandum of Law in Opposition, Dkt. No. 14 ("Pl.'s Opp."), at 4 (discussing

Compl., Exs. A-C, § 8.05).)  Section 8.06(a) of the Reinsurance Agreements mandates that the

provisional commissions "be adjusted for each agreement year," based upon explicit criteria

associated with the actual performance of the insurance business, such as the loss ratio incurred

---

(Compl., Exs. A-C, §§ 2.03.)

[3] The Preamble of each Reinsurance Agreement clarifies that "the Reinsurer" refers to Greenlight, "the Company" refers to either United Specialty Insurance Company and/or State National Insurance Company, Inc., and "the General Agent" refers to AUI.  Moreover, collectively, the Company, the Reinsurer, and the General Agent are referred to as "the Parties" throughout the Reinsurance Agreements.  (Compl., Exs. A-C, Pmbl.)

on the insurance program.  (Compl., Exs. A-C, § 8.06(a).)  Put simply, each of the Reinsurance

Agreements defines a minimum commission rate for AUI, which is accordingly less than AUI's

provisional commission rate.  For example, if the performance of the underlying insurance at

issue was poor, then AUI would be entitled to only the minimum commission, and would have to

remit to Greenlight the provisional commission less the minimum commission.  If the opposite

were true, meaning "the ratio of losses incurred to premiums earned [was] less than what

Greenlight and [AUI] anticipated in the reinsurance Agreements," Greenlight was required to

"return additional premium amounts to [AUI], increasing [AUI's] commission."  (Memorandum

of Law of Defendants Appalachian Underwriters, Inc. and Insurance Services Group, Inc., Dkt.

No. 13 ("Def.'s Mem."), at 3.)

 Section 8.06 of the Reinsurance Contracts requires AUI to "calculate and report the

adjusted commission on ceded premiums earned within 60 days after 12 months after the end of

each Agreement Year, and within 60 days after the end of each 12-month period thereafter until

all losses [under the contract] are fully settled."  (Compl., Exs. A, § 8.06(c); B-C, §§ 8.06(d).)  If

this calculation reveals that the "adjusted commission on ceded premiums earned for the

agreement year, [AUI] shall remit the difference to [Greenlight] with its report."  (*Id.*)  In short,

"AUI was required to remit its adjusted commission amounts on the Report and Remittance

Dates."  (Pl.'s Opp. at 5.)  According to Plaintiffs, to date, AUI has failed to remit $13 million in

contractually required funds to Greenlight.  The $13 million figure was calculated by examining

the difference between the amount of commission to which AUI was entitled given the premiums

and losses, and the amount of commission AUI had already taken.

 There is no "reconciliation" procedure in Article 8, by which disputes concerning the

amount owing or the commission calculations can be resolved between AUI and Greenlight, save

one subsection of Article 8 of the 2010 and California Reinsurance Agreements, which provides

that if there is a dispute as to the Ultimate Loss Ratio, such dispute will be determined by a third

party actuary.[4]  (Compl., Exs. B, C, § 8.06(i).)  According to Greenlight, however, all parties

agree that the Ultimate Loss Ratios are high enough that AUI is entitled only to its minimum

commission, which is lower than the aforementioned provisional commission.

The three Reinsurance Agreements also contain an identical Arbitration Clause, which

states as follows:

> As a condition precedent to any right of action hereunder, in the
> event of any dispute or difference of opinion hereafter arising
> between the Company [referring to the Insurance Companies] and
> the Reinsurer [referring to Greenlight] with respect to this
> Agreement, or with respect to these Parties' [referring to the
> Insurance Companies, Greenlight, and AUI] obligations hereunder,
> it is hereby mutually agreed that such dispute or difference of
> opinion shall be submitted to arbitration.

(*Id.*, Exs. A-C, § 10.01.)  Article 10 also provides details for the arbitration procedure, discussing

the process by which the Insurance Companies and Greenlight may each appoint an arbitrator,

and noting that each party's case was to be presented to the arbitrators and neutral umpire, within

a "reasonable amount of time" after the selection of said umpire.  (*Id.*)  Additionally, § 10.05 of

each of the Reinsurance Agreements clarifies that:

> In the event of a dispute between the Company and the Reinsurer
> concerning this Agreement and the General Agency Agreement

---

[4] Section 8.06(i) of the 2010 and California Reinsurance Agreements reads:
> "Ultimate Loss Ratio" shall mean Losses Incurred (including
> losses carried forward) divided by Premiums Earned.  Such
> Ultimate Net Loss Ratio will be mutually agreed by the General
> Agent and the Reinsurer.  In the event that the General Agent and
> the Reinsurer cannot agree, the Ultimate Loss Ratio will be
> determined by an independent third party actuary who is agreeable
> to both parties.  The cost of such actuary shall be shared equally.

(*Id.*, Exs. B, C, § 8.06(i).)

(regardless of whether either party has claims against the General
Agent), the entire dispute between the Company and the Reinsurer
shall be subject to arbitration as provided in this Article X.

(*Id.*, § 10.05.)  The "General Agency Agreements" refer to three agreements, mentioned in the

Reinsurance Contracts, among the Insurance Companies, Greenlight, and AUI.  (*Id.*, § 18.01.)

And while these General Agency Agreements were explicitly incorporated in the Reinsurance

Agreements, they were not provided to the Court, and neither party appears to assert rights under

them.  Article 18 also appears to insulate the Insurance Companies from any attempt on the part

of the AUI to seek arbitration against them for purported wrongdoing on the part of Greenlight,

stating as follows: "The General Agent shall not sue, or seek arbitration, against the Company

for any acts of the Reinsurer and shall indemnify and hold the Company harmless from and

against any damages, liabilities and expenses incurred by reason of the Reinsurer's acts or

failures to act."  (*Id.*, § 18.05.)  And finally, the Reinsurance Agreements designate Tarrant

County, Texas as the venue for any controversy arising out of the Agreements, including

arbitration.  (*See id.*, §§ 20.01 ("This Agreement has been made and entered into in the State of

Texas and the Agreement shall be subject to and construed under the laws of the state of

Texas."); 10.07 ("This Agreement shall be interpreted under the laws of Texas and the arbitration

shall be governed and conducted according to the Texas General Arbitration Act.").)

## 2. The Retrocession Contracts

From time to time, Reinsurers contract with other reinsurers to spread some of their own

risk; here, Greenlight did just that in two separate contracts referred to as "the Retrocession

Agreements."  Greenlight entered into (1) the Quota Share Retrocession Agreement Effective

July 1, 2008 ("the 2008 Retrocession Agreement"); and (2) the Quota Share Retrocession

Agreement Effective July 1, 2010 ("the 2010 Retrocession Agreement").  (Compl., Exs. D, E.)

These Retrocession Agreements are between Greenlight and Appalachian Reinsurance

(Bermuda) Ltd. ("AppRe"), which is the Bermudian affiliate of AUI and Defendant ISG.  Thus,

Greenlight, whose Reinsurance Agreements with the Insurance Companies were managed by

AUI, entered into the Retrocession Agreements with AppRe, an AUI affiliate.

The terms of the Retrocession Agreements require AppRe to "post collateral" for

AppRe's "portion of any projected payments for losses incurred on the underlying reinsurance

agreements between Greenlight and the Companies."  (Pl.'s Opp. at 7 (citation omitted).)

Pursuant to the Retrocession Agreements, AppRe agreed to accept various percentages "of

[Greenlight's] gross liability under all business assumed by [Greenlight] under the [Reinsurance

Agreements]."  (Compl., Exs. D, E, Art. 2.)  Essentially, if the Loss Ratio reached a certain

threshold, AppRe was required to reimburse Greenlight for a portion of the costs of this

collateral.   As a general rule, the portion of contractually required collateral increases

proportionally as the incurred net loss ratio increases.  (Compl. at ¶ 33.)   Greenlight alleges that

as of August 31, 2012, $12,062,902 in collateral remained owing under the 2008 Retrocession

Agreement and $17,549,760 in collateral remained owing on the 2010 Retrocession Agreement.

(*Id.* at ¶¶ 35-38.)

With respect to dispute resolution, the Retrocession Agreements, in Article 11, provide

for arbitration as follows:

> Any dispute or other matter in question between the Company
> [Greenlight] and the Reinsurer [AppRe] arising out of, or relating
> to, the formation, interpretation, performance, or breach of this
> Agreement, whether such dispute arises before or after termination
> of this Agreement, shall be settled by arbitration. . . . The
> arbitration hearings shall be held in Grand Cayman, Cayman
> Islands, or such other place as may be mutually agreed.

7

(Compl., Exs. D, E, Art. 11.)  Similar to the Reinsurance Agreements, Article 11 of the

Retrocession Agreements details the procedure by which arbitrators are to be appointed, also

specifying the time period during which such appointments, and the subsequent arbitration, are

to take place.  (*See, e.g.*, *id.* ("Each party shall submit its case to the arbitrators within sixty (60)

days of the selection of the third arbitrator or within such longer period as may be agreed by the

arbitrators.").)

### 3. The Guarantees

Before entering into the Retrocession Agreements, realizing that AppRe was neither a

Cayman Islands nor United States entity, Greenlight "demanded and received two guarantees

from Defendants ISG and AUI."[5]  (Compl. at ¶ 40.)   The first guaranty, the so-called "Parental

Guarantee," between Greenlight and Defendants, purports to obligate ISG and AUI to "meet any

of [AppRe's] obligations to [Greenlight]" (*id.* at ¶ 42), providing, in pertinent part:

> ISG and AUI are the sole owners of the share capital of various
> ISG group [sic] of companies, which transact reinsurance and
> retrocessional business with [Greenlight] . . . , and as such does
> [sic] hereby guarantee financial support for ISG group companies
> in respect for [sic] their business operations . . . .

(*Id.*, Ex. F.)  Specifically, the Parental Guarantee obligates ISG to "fully support all group

companies," in order "to ensure the companies are at all times fully funded and particularly able

to meet all its [sic] obligations to [Greenlight]."  (*Id.*)  In other words, "[i]n order to ensure

continued solvency and liquidity of the ISG group companies," ISG promised to "when

necessary, fully support all group companies with this guarantee of such amount being the dollar

---

[5] While Greenlight alleges that this Parental Guarantee was a "condition" of the Reinsurance
Agreements, it appears that the first Reinsurance Agreement, dated July 14, 2008, occurred and
went into effect before the September 10, 2008 Parental Guarantee was signed.  (*Compare*
Compl. Ex. A *with id.*, Ex. F.)

amount to meet such requirements, in any financial year." (*Id.*)  This Parental Guarantee is also irrevocable without the prior written consent of Greenlight, which, to date, Greenlight has not provided.  (*Id.*)

The second guarantee, the so-called "2009 Guaranty," was also provided to Greenlight (and others) by AUI and ISG.  (*Id.*, Ex. G.)  This guarantee was a condition of Greenlight's entering into the "relevant contracts," which Greenlight defines as the Reinsurance and Retrocession Agreements.  (*Id.* at ¶ 47.)  The 2009 Guaranty lists the "relevant contracts," subject to its guarantee, in its Exhibit B as follows: (1) 2009 Quota Share between AIC and Greenlight Re—AIC – ML QS-0109; (2) 2009 Retrocessional Agreement between Greenlight Re and Appalachian Reinsurance (Bermuda) Ltd.-APRE-10-0109; (3) 2008 – Quota Share Agreement; (4) 2008 – State National Quota for  Appalachian Underwriters; (5) 2008 – American Building Insurance Company Retrocession from Greenlight to Appalachian Reinsurance (Bermuda) Ltd.  (*Id.*, Ex. G, Ex. B at B-1.)  The 2009 Guaranty also provides that "[a]ny contract between any Guarantor Affiliate and any Greenlight Re Party shall automatically as a condition precedent to entering into the contract, be added as a Relevant Contract . . . ."  (*Id.*, § 10(m).)  Insofar as the protection it provides, the 2009 Guaranty itself states, *inter alia*, that:

> [E]ach Guarantor hereby absolutely, unconditionally and irrevocably guarantees, on a joint and several basis, as primary obligors and not merely as sureties, . . . the full and prompt payment and performance to the applicable Greenlight Re Parties at any time and from time to time as and when the same becomes due or performance strictly and in accordance with the terms and provisions of each of the Relevant Contracts of any and all obligations of the Guarantor Parties under the Relevant Contracts . . . .

(*Id.* at § 2(a)(ii).)  This guaranty, Plaintiffs contend, holds ISG and AUI responsible for the monies owing on the underlying Reinsurance and Retrocession Agreements.

Plaintiffs also allege that pursuant to the 2009 Guaranty, Defendants guaranteed amounts owed on a loan from Verdant to AIC Holdings, LLC, another affiliate of both Defendants.  (*Id.* at 1.)  For example, the Guaranty section of the 2009 Guaranty also includes a provision promising "full and prompt payment and performance to the Lender at any time and from time to time as and when the same becomes due or performable strictly in accordance with the terms and provisions of the Promissory Note . . . ."  (*Id.* at § 2(a)(i).)  Both Verdant and Greenlight, as parties to the 2009 Guaranty, were purportedly protected by various covenants contained in Chapter 10, such as the covenant that AUI and ISG would not "permit . . . any Guarantor Affiliate or any of their respective Subsidiaries to[] take any action or fail to take any action if such action or failure to act would result in . . . a default under or breach of any Relevant Contract."  (*Id.* at § 10(a); *see also id.* at 10(g) (covenanting that AUI would not incur indebtedness in excess of $5 million).)

### B.      Procedural Background

Plaintiffs filed their Complaint, together with the Reinsurance Agreements, Retrocession Agreements, and Guarantees, on November 21, 2012.  (Dkt. No. 1.)  In December 2012, Defendants filed their motion to dismiss (Dkt. No. 12), and Plaintiffs filed their opposition on January 13, 2013 (Dkt. No. 14.)  Defendants replied on January 15, 2013.  (Dkt. No. 17.)  The Parties have also exchanged letters on the status of Arbitration, each vigorously disputing the other's position and approach.  (*See* Dkt. Nos. 19, 20.)

In their Complaint, Greenlight and Verdant assert four causes of action: (1) declaratory judgment pursuant to 28 U.S.C. § 2201, with respect to Defendants' obligations under the guarantees ("Count One"); (2) breach of contract with respect to Defendants' primary obligations under the guarantees ("Count Two"); (3) breach of contract associated with various covenants in

10

the guarantees ("Count Three"); and (4) breach of contract and right to accounting pursuant to the 2009 Guaranty ("Count Four").

## II.      Motion to Dismiss Standard

Generally, when deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a court is obliged to "accept as true all of the factual allegations contained in the complaint," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 572 (2007), drawing "all inferences in the light most favorable to the non-moving party's favor." *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007). In so doing, courts are "not limited to the face of the complaint," but "may [also] consider," *inter alia*, "any written instrument attached to the complaint . . . ." *In re Scottish*, 524 F. Supp. 2d 370, 382 (S.D.N.Y. 2007) (quotation marks and citations omitted).

While Federal Rule of Civil Procedure 8(a) requires only a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to avoid dismissal, a plaintiff must state "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."). At bottom, a plaintiff's facts must give rise to a plausible narrative supporting his claim. *See Twombly*, 550 U.S. at 570 ("Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.").

11

Defendants also move to dismiss certain of Plaintiffs claims for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1). "Generally, a claim may be properly dismissed for lack of subject matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it." *Kingsley v. BMW of N. Am. LLC*, No. 12 Civ. 234, 2012 WL 1605054 (JPO), at *2 (S.D.N.Y. May 8, 2012) (citing Fed. R. Civ. P. 12(b)(1); *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). District courts are permitted to look to materials outside of the pleadings in determining subject matter jurisdiction. *Makarova*, 201 F.3d at 113 ("In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court, as it did here, may refer to evidence outside the pleadings."). And while the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence, *id.*, "all ambiguities must be resolved and inferences drawn in favor of the plaintiff." *Kingsley*, 2012 WL 1605054, at *2 (citations omitted).

## III.    Discussion

### A.    Greenlight's Claims: Counts One, Two, and Three

#### 1.    Ripeness and Exhaustion

Defendants first move to dismiss Plaintiffs' claims on ripeness grounds, alleging that the amount due under the Reinsurance and Retrocession agreements has yet to be determined, and as such, the Court "is being asked to rule [on] purely hypothetical disputes that may never arise." (Def.'s Mem. at 9.) According to Defendants, "there is a lack of jurisdiction against guarantors until the underlying claims are established." (*Id.*)

It is well established that "Article III of the Constitution precludes the resolution of a legal challenge 'in the absence of [a] direct and immediate dilemma.'" *Sea Tow Servs. Int'l, Inc. v. Pontin*, 472 F. Supp. 2d 349, 357 (E.D.N.Y. 2007) (internal quotations omitted) (alteration in

original).  Accordingly, "'[a] claim is not ripe for adjudication if it rests upon contingent future

events that may not occur as anticipated, or indeed may not occur at all.'"  *Weidberg v. Barnett*,

752 F. Supp. 2d 301, 310 (E.D.N.Y. 2010) (quoting *Texas v. United States*, 523 U.S. 296, 300

(1998) (alteration in original)).  And while "[d]amages cannot be based on speculation," *Edrei v.

Copenhagen Handelsbank A/S*, No. 90 Civ. 1860, 1991 WL 64201 (CSH), at *5 (S.D.N.Y. Apr.

18, 1991), pursuant to New York law, "[a] breach of contract case . . . is ripe immediately upon

the [alleged] breach, even where damages remain uncertain."  *Sea Tow*, 472 F. Supp. 2d at 357

(quotations and citation omitted) (alteration in original).  It is the plaintiff who bears the burden

of pleading ripeness, indicating that "the facts alleged, under all the circumstances, show that

there is a substantial controversy, between parties having adverse legal interests, of sufficient

immediacy and reality to justify judicial resolution."  *Marchi v. Bd. of Coop. Educ. Servs.*, 173

F.3d 469, 478 (2d Cir. 1999) (quotations and citation omitted).  "To determine whether a case is

ripe requires a two-pronged inquiry into '[1] the fitness of the issues for judicial decision and [2]

the hardship to the parties of withholding court consideration.'"  *Thomas H. Lee Equity Fund V,

L.P. v. Bennett*, No. 05 Civ. 9608, 2007 WL 950133 (GEL), at *3 (S.D.N.Y. Mar. 28, 2007)

(quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)).

      Here, with respect to the first prong, Plaintiffs have alleged sufficient facts to present a

"direct and immediate dilemma," *U.S. v. Johnson,* 446 F.3d 272, 278 (2d Cir. 2006), as required

by ripeness doctrine: namely, the alleged breach of two separate Guarantees pursuant to which

Defendants were to pay the amount owing on the underlying Reinsurance and Retrocession

contracts, in the event that Plaintiffs failed to receive the monies due under said agreements.  The

fact that there has been no judicial or arbitration finding of liability on the underlying agreements

is immaterial to the justiciability of Plaintiffs' claims for their failure to guarantee the

Reinsurance and Retrocession contracts.  Put another way, Plaintiffs allege that they are owed

money under various agreements—agreements which Defendants purportedly guaranteed; they

further allege that they have not yet been paid the monies due under those same agreements; and

accordingly, they seek to enforce the putatively applicable Guarantees against Defendants.  The

fact that damages have not yet been fixed does not negate the very real rights and liabilities

associated with Plaintiffs underlying claims.  *But see Weidberg*, 752 F. Supp. 2d at 310

(dismissing Plaintiff's fraudulent inducement claim on ripeness grounds, noting that despite

Plaintiff's guarantees, as no party was "presently making [a] demand based on the plaintiff's

personal guarantee of its loan," the claim was too speculative to survive summary judgment).

What is more, the so-called "Reconciliation Procedure," which Defendants refer to in their brief

as an important prerequisite to the eventual determination of liability, is nowhere to be found in

the Reinsurance Agreements.  Plaintiffs are correct in noting that Article 8 of the Reinsurance

Agreements does not, in fact, contain a dispute resolution provision, but rather, details the

procedures by which AUI was to relay and remit various monies to Greenlight.  (Pl.'s Opp. at

17-18.)  At bottom, "[t]he issues to be determined here are only [the primary obligors'] liability

and the scope of [Defendants'] contractual obligation, so there is no obstacle to an informed

judicial decision at this time.  This is not a case that 'presents issues that might never arise.'"

*Thomas Lee*, 2007 WL 950133, at *4 (quoting *United States v. Johnson*, 446 F.3d 272, 279 (2d

Cir. 2006)).

        As for the second prong, hardship, the Court agrees with Plaintiffs that a postponement of

judicial decision-making would only delay "recovery for the plaintiffs if they are so entitled or a

finding of no liability for [Defendants]."  *Id.*  Accordingly, the claims are ripe for judicial

review.

In a similar vein, Defendants argue that under the terms of the Reinsurance and Retrocession Agreements, arbitration is a prerequisite to Plaintiffs' causes of action against Defendants as guarantors of the alleged monies owing under those contracts, and as such must be exhausted before judicial review.  The Court disagrees.

First, Plaintiffs are asserting claims under the *Guarantees*, rather than under the Reinsurance and Retrocession Agreements.  And while those latter agreements indeed contain arbitration clauses, crucially, the Guarantees contain only a forum selection clause, specifying the Southern District of New York as the proper venue.  Admittedly, the Arbitration Clause in the Reinsurance Agreements does discuss "these Parties' obligations hereunder," referring to the Insurance Companies, Greenlight, and AUI; however, the Clause is primarily applicable to Greenlight and the Insurance Companies, rather than Greenlight and the MGA—here, AUI. (Compl., Exs. A-C, § 10.01.)  Additionally, the Guarantees are clearly separate from, rather than part and parcel of, the original agreements, and Defendants have pointed to no plain language from the Guarantees suggesting that the Arbitration Clause in the Reinsurance Agreements limits Plaintiffs' rights as against the guarantors of those agreements.  Second, the Arbitration Clause in the Retrocession Agreements, calling for arbitration in the Cayman Islands, contemplates disputes arising between Greenlight and AppRe, the Bermudian affiliate of AUI.  (*Id.*, Exs. D, E, Art. 11.)  Accordingly, as there is nothing to suggest corporate veil issues or contractual privity between AppRe and AUI, Defendants cannot seriously be considered "parties" in the traditional sense to the Retrocession Agreements.  (*See* Pl.'s Opp. at 19 n.9 ("The only issue that will be resolved in arbitration between Greenlight and App Re is the amount of the debt App Re owes to Greenlight.").)

Second, contrary to Defendants' characterization, guarantees do not necessarily require that a plaintiff exhaust "all efforts to collect from the principal obligor" before bringing a case against the guarantor.  *Gen. Phoenix Corp. v. Cabot*, 300 N.Y. 87, 93, 89 N.E.2d 238 (1949) ("An action against such a surety brought before all efforts to collect from the principal obligor have failed is not premature.").  "A guaranty is a collateral promise to answer for the payment of a debt or obligation of another, in the event the first person liable to pay or perform the obligation fails."  *New York City Dep't of Fin. v. Twin Rivers, Inc.*, 920 F. Supp. 50, 52 (S.D.N.Y. 1996).  Such a guarantee can take the form of "either a guaranty of payment or of collection[,]" and courts must examine "the language of the specific guaranty to determine the nature of the guaranty."  *Id.*  In contrast to a guarantor of collection, who must fulfill two conditions precedent before a putative plaintiff may attempt judicial enforcement, "a guarantor of payment undertakes an unconditional guaranty that the debtor will pay on the debt," meaning that "[i]f for some reason, the debtor fails to make payment to the creditor, he can proceed directly against the guarantor."  *Id.* at 53.  Whereas a guaranty of collection requires that "one, a legal proceeding must be initiated against the principal debtor, and two, the party seeking payment is unable to collect from the principal debtor after he exercised due diligence in attempting to collect the debt[,]" *id.*, a guaranty of payment does not mandate that a creditor seeking enforcement "take any preliminary steps against the principal debtor before he seeks to collect the debt owed from the guarantor of payment[,]" *id.*; *accord In re S. Side House, LLC*, 470 B.R. 659, 675 (Bankr. E.D.N.Y. 2012) ("The fundamental distinction between a guaranty of payment and one of collection is, that in the first case the guarantor undertakes unconditionally that the debtor will pay, and the creditor may, upon default, proceed directly against the guarantor, without taking any steps to collect of the principal debtor, and the omission or neglect

to proceed against him is not (except under special circumstances) any defense to the guarantor

. . . ." (citation omitted)).

As a general rule,

> [I]f the parties to a contract identify one party as a 'guarantor' or the contract as a 'guaranty,' the party so identified is a secondary obligor and the secondary obligation is, upon default of the principal obligor on the underlying obligation, to satisfy the obligee's claim with respect to the underlying obligation . . . .

Restatement (Third) of Suretyship & Guaranty § 15(a) (1996).  Here, both the Parental

Guarantee and the 2009 Guaranty represent this particular brand of contractual relationship,

seemingly obligating Defendants as guarantors of payment, rather than collection.  *See, e.g.*, *AXA*

*Inv. Managers UK Ltd. v. Endeavor Capital Mgmt. LLC*, 890 F. Supp. 2d 373, 384 (S.D.N.Y.

2012) ("In stressing that Buffa guarantees '*payment* of all sums due by Endeavor under this

Agreement[,]' the provision clearly establishes itself as a payment guaranty.  This is significant

because 'New York State courts have long recognized that when a party guarantees payment of a

debt, as opposed to collection of a debt, the guaranty is absolute and unconditional.'" (internal

citation omitted)).  Notably, the Guarantees at issue here do not define Defendants as "secondary

obligors," who must only "satisfy the obligee's claim with respect to the underlying obligation"

in certain, limited circumstances, such as where the principal obligor is insolvent.  *See*

Restatement (Third) of Suretyship & Guaranty § 15(b)(1)-(4) (1996).  Instead, the contractual

language of at least the 2009 Guaranty explicitly denotes that Defendants are intended as

*primary* rather than secondary obligors.  (*See* Compl., Ex. G, § 2(a)(ii).)  Thus, while actual

liability will be determined later, and will necessarily be based on the terms of the underlying

contracts, *Exp.-Imp. Bank of U.S. v. Agricola Del Mar BCS, S.A. de C.V.*, 536 F. Supp. 2d 345,

350 (S.D.N.Y. 2008), there is nothing to suggest that Plaintiffs were obligated to arbitrate their

claims against the underlying obligors before seeking judicial recourse from Defendants as guarantors of payment.  While "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability[,]"*ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 29 (2d Cir. 2002), importantly, "[a]rbitration . . . is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit."  *Id.* (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989) (quotations omitted) (alteration in original)).  And here, AppRe and the Insurance Companies agreed to arbitration, but Plaintiffs, together with the defendant guarantors, in their operative agreement, did not.

Additionally, Defendants contend that, "at the very least," the Court should stay the instant case pending resolution of the arbitrable claims associated with the Retrocession Agreements.  The Court disagrees.

Courts have "inherent powers" to grant a stay "where the pending proceeding is an arbitration in which issues involved in the case may be determined."  *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) (quoting *Nederlandse Erts-Tankersmaatschappij, N.V. v. Isbrandtsen Co.*, 339 F.2d 440, 441 (2d Cir. 1964) (quotations omitted)).  It is the party seeking to stay proceedings that "must first establish that 'there are issues common to the arbitration and the courts, and that those issues will finally be determined by the arbitration.'"  *Orange Chicken, L.L.C. v. Nambe Mills, Inc.*, No. 00 Civ. 4730, 2000 WL 1858556 (AGS), at *9 (S.D.N.Y. Dec. 19, 2000) (quoting *Am. Shipping Line, Inc. v. Massan Shipping Indus., Inc.*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)).  The burden is on the movant to show (1) "that it will not hinder arbitration," (2) "that the arbitration will be resolved within a reasonable time," and (3) "that such delay that may occur will not cause undue hardship to the non-moving party."  *Id.*

Here, Defendants have not met their burden.  While the underlying liability under the

Reinsurance and Retrocession Agreements can indeed be construed as an issue "common to the

arbitration and the courts," the other factors weigh strongly against staying this litigation.  First,

Plaintiffs have provided documentation suggesting that Defendants have used arbitration as a

delay tactic, and have failed to adhere to both the arbitration timeline and the arbitration

procedures provided for in the Retrocession Agreements.  (Pl.'s Opp. at 23.)  And while

Defendants dispute this claim (*see, e.g.*, Dkt. No. 20), Defendants have failed to convince the

Court that they will cooperate with arbitration or that arbitration will be resolved within a

reasonable time.  Moreover, it is clear that delay will cause undue hardship to Plaintiffs, as it will

merely postpone, perhaps indefinitely, the return of any funds to which they are entitled.

Accordingly, a stay is not appropriate given the circumstances.

### 2.    Guarantees

Alternatively, Defendants move to dismiss Plaintiffs' breach of contract claims pursuant

to Rule 12(b)(6), for failure to state a claim.  Plaintiffs' breach of contract claims derive from the

Guarantees, and relate to not only the commission and collateral purportedly owed under the

Reinsurance and Retrocession Agreements (Count Two), but also the alleged breach of separate

covenants in the 2009 Guaranty (Count Three).  Each claim is addressed in turn.

### a.    Commission and Collateral (Count Two)

Count Two asserts breaches by Defendants of their obligations as guarantors for the

commission and collateral allegedly owing under the terms of the Reinsurance and Retrocession

Agreements.

In order to survive a motion to dismiss on a breach of guaranty claim in New York, a

plaintiff must plausibly plead "(1) that it is owed a debt from a third party; (2) that the defendant

made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the

third party or the defendant." *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994)

(citation omitted); *accord Samsara Inv. III, LLC v. Wallace*, No. 07 Civ. 9385, 2008 WL

3884362 (JFK), at *2 (S.D.N.Y.  Aug. 21, 2008); *cf. Thomas H. Lee*, 2007 WL 950133, at *3

("Grant argues that the claim against him cannot be pursued until plaintiffs first establish Refco's

liability and seek payment directly from Refco. . . . Grant argues that a creditor may not seek to

recover from a guarantor until it has tried and failed to recover from the primary obligor.  This

argument is mistaken." (internal citations omitted)).

Here, Greenlight has plausibly stated a claim under the Guarantees.  First, the Complaint

details the contractual provisions within the Reinsurance and Retrocession Agreements by which

Greenlight was to receive certain portions of AUI's commission and certain collateral from

AppRe, respectively.  Citing specific contractual provisions, Greenlight plausibly argues that it is

owed approximately $13 million from AUI in commission adjustments under the Reinsurance

Agreements and approximately $29 million from AppRe in collateral, pursuant to the

Retrocession Agreements.  Greenlight even parses its calculation for these numbers, supplying a

plausible narrative of their origin.  Accordingly, Greenlight has satisfied the first element of its

guaranty claim: namely, that it is "owed a debt by a third party."  Second, Greenlight has also

plausibly established that Defendants guaranteed the monies owing under the Reinsurance and

Retrocession agreements, pointing to two separate Guarantees—the Parental Guarantee and the

2009 Guaranty, in which both Defendants agreed to safeguard Greenlight against default on the

part of, at the very least, AppRe, and quite possibly as well as AUI's and the Insurance

Companies' obligations under the Reinsurance Agreements.  Moreover, the language of these

Guarantees appears to be that of a guaranty of *payment* rather than of collection, meaning

20

"enforcement of a guarantee of payment is not conditioned on exhaustion [of remedies against the defaulting obligor]." *Thomas H. Lee*, 2007 WL 950133, at *3.  And finally, the Court takes as true Greenlight's allegation that it has not been paid the commission and collateral it seeks, satisfying the third required element of a guaranty claim.  Accordingly, Greenlight plausibly states a claim for breach of the Guarantees, as related to the monies allegedly owing on the Reinsurance and Retrocession Agreements.

### b.    Covenants  (Count Three)

Greenlight also asserts various breaches of the guarantor covenants contained in Section 10 of the 2009 Guaranty.  Section 10(a) of the 2009 Guaranty provided that AUI and ISG would "not, and [would] not permit . . . any Guarantor Affiliate or any of their respective Subsidiaries to, take any action or fail to take any action if such action or failure to act would result in  . . . a default under or breach of any Relevant Contract."  (Compl., Ex. G, § 10(a).)  Additionally, § 10(g) prohibited AUI and ISG from incurring indebtedness in excess of $5,000,000.  As Defendants do not move to dismiss Greenlight's claims deriving from these § 10 covenants, Count Three, with respect to Greenlight, accordingly survives Defendants' motion.

### B.    Accounting Claim (Count Four)

In Count Four, Plaintiffs assert a right to an accounting, pursuant to § 10(e) of the 2009 Guaranty, which provides for inspection of Defendants' books and records.  Defendants move to dismiss this claim on the ground that Plaintiffs have failed to allege that they have been denied access to any financial records, noting that "Plaintiffs do not even allege that they have not seen the sought after records."  (Def.'s Mem. at 17.)  In response, Plaintiffs argue that the Court should infer from the Complaint that Plaintiffs have not been given access to Defendants' books

and records, and thus "are entitled to know whether the Defendants have assets sufficient to satisfy their obligations."  (Pl.'s Opp. at 15.)

"Under New York law, '[t]he right to an accounting is premised upon the existence of a confidential or fiduciary relationship and a breach of duty imposed by that relationship representing property in which the party seeking the accounting has an interest.'"  *Chamarac Properties, Inc. v. Pike*, No. 86 Civ. 7919, 1992 WL 332234 (KMW), at *20 (S.D.N.Y. Nov. 2, 1992) (quotations and citations omitted); *see also Palazzo v. Palazzo*, 121 A.D.2d 261, 503 N.Y.S.2d 381, 384 (1st Dep't 1986).  "Upon a showing that plaintiff entrusted property to a fiduciary, the fiduciary is bound to reveal his dealings with that property."  *Hoyle v. Dimond*, 612 F. Supp. 2d 225, 232 (W.D.N.Y. 2009); *accord Benenson v. Fleischman*, No. 94 Civ. 5009, 1995 WL 303618 (CSH),  at *6 (S.D.N.Y. May 18, 1995) (explaining, in the partnership context, that "[i]n order to enlist the aid of a court of equity in vindicating the right to an accounting, a plaintiff must show: (1) the existence of a partnership, (2) the transaction of business by the partnership producing profits or losses to be accounted for, (3) the termination or dissolution of the partnership, (4) a demand for an accounting and (5) a failure or refusal by the partner with the books, records, profits or other assets of the partnership in his possession to account to the other partner or partners." (citation omitted)).

Here, Plaintiffs contend that § 10(e) constitutes a "contractual right to an accounting." (Pl.'s Opp. at 15.)  However, they have failed to plead breach of this covenant with sufficient specificity.  It is not enough that Plaintiffs, as a matter of inference, have not seen Defendants' books and records; instead, in order to be in breach of § 10(e), it appears the Defendants would have had to have (1) failed to maintain adequate books, accounts, and records; or (2) refused to permit Plaintiffs' employees or agents, upon reasonable notice, to inspect or audit its books or

records.  Although Plaintiffs' Complaint is detailed in other respects, it fails to make any such

allegations, and instead merely asserts, in a conclusory fashion, that Plaintiffs are entitled to

know the extent of Defendants' liquidity.  That may be true, but in order to adequately allege a

breach as set forth in Count Four, which is premised on a particular covenant in the 2009

Guaranty, Plaintiffs must plead their lack of access with greater specificity.  Accordingly, Count

Four is dismissed, but with leave to replead.

### C.     Verdant's Claims: Counts One, Two, and Three

Defendants also move to dismiss Plaintiff Verdant's claims, asserting that Verdant is not

a proper party and that the Complaint is devoid of allegations that Verdant has suffered any

damages under the relevant agreements.  (Def.'s Mem. at 16.)  The Court agrees that Verdant's

claims lack particularity.

Verdant is indeed a party to the 2009 Guaranty, and the agreement constitutes not only a

provision of security for Greenlight, but also a guaranty of amounts owed on a loan to AIC

Holdings, LLC.  As AIC Holdings is an affiliate of both Defendants, the 2009 Guaranty appears

to operate as a guaranty of AIC Holdings' promissory note issued to Verdant.  However, if the

Complaint intends to assert Counts One and Two on behalf of Verdant, as well as Greenlight, it

fails to do so with sufficient specificity, as there are no allegations in the Complaint that Verdant

has suffered harm as a result of a default on the Promissory Note.  And while the Promissory

Note indeed provides for various remedies in the event of default (Declaration of Brendan Barry,

Dkt. No. 15 ("Barry Decl."), Ex. 4, § 7), the Complaint fails to allege with specificity any default

on the part of AIC, and does not acknowledge the requisite harm to Verdant.  Similarly, with

respect to Count Three, the mere existence of covenants not to incur a certain threshold of

indebtedness, together with a conclusory assertion that said threshold has (1) been reached and

(2) negatively affected Verdant, is insufficient to survive a motion to dismiss.  Moreover, Count Four, seeking an accounting, for the reasons discussed above, fails to survive Defendants' motion to dismiss.  Nevertheless, given the often-curable nature of a Complaint lacking particularity, especially when, as here, the claims appear to be governed by integrated contracts, Verdant may replead its causes of action.

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  With respect to Plaintiff Greenlight, Defendants' motion is DENIED except with respect to Count Four, which is dismissed with leave to replead within thirty days of the date of this Opinion and Order.  With respected to Plaintiff Verdant, Defendants' motion is GRANTED as to all counts, which are dismissed with leave to replead within thirty days of the date of this Opinion and Order.

The Clerk of Court is directed to close the motion at docket entry number 12.


SO ORDERED.


Dated: New York, New York
       July 25, 2013

J. PAUL OETKEN
United States District Judge

24