UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                    :

GREENLIGHT REINSURANCE,       :
LTD.,

                           Plaintiff,   :         12-CV-8544 (JPO)

                                      :

              -v-              :        <u>OPINION AND ORDER</u>

                                      :

APPALACHIAN UNDERWRITERS,   :
INC.;                                  :
INSURANCE SERVICES GROUP, INC.,  :
                        Defendants. :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      Plaintiff Greenlight Reinsurance, Ltd. (Greenlight Re) sues Appalachian Underwriters,

Inc. (AUI) and Insurance Services Group, Inc. (ISG) for breach of guarantees of payment and

breach of contract, seeking both money damages and declaratory relief.  Greenlight Re has

moved for summary judgment on all claims.  For the reasons that follow, Greenlight Re's motion

is granted in part and denied in part.

**I.**      **Background**

      The following facts are unconstested unless otherwise noted.  Greenlight Re is a

reinsurance company based in the Cayman Islands.  (Defs.' 56.1 Stmt. ¶ 1, Dkt. No. 41.)  This

action concerns multiple agreements between Greenlight Re and other parties including ISG,

AUI, and Appalachian Reinsurance (App Re), an affiliate of ISG and AUI.  (*Id.* ¶¶ 4–6, 27–28,

53, 58–59.)  The agreements fall into three general types, each of which the Court will discuss in

turn.

### A.   Reinsurance Agreements

The first type of agreement is a reinsurance agreement.  By such agreements, an insurance company shares some of the risk associated with its policies with a reinsurance company; in exchange, the reinsurance company receives a portion of the premiums from the underlying policies.  (*Id.* ¶ 9.)  That portion is called a "ceded premium."  (*Id.* ¶ 10.)  The reinsurance agreements in this case also involve a managing general agent: a company responsible for writing the underlying insurance policies, collecting ceded premiums from the insurance companies, and paying the reinsurance company.  (*Id.* ¶ 8.)  The managing general agent keeps a portion of all ceded premiums as a commission.  (*Id.* ¶ 11.)  The percentage commission that the managing general agent may retain depends on the performance of the underlying insurance policies.  (*Id.* ¶ 15.)

There are three reinsurance agreements at issue in this case.  (*Id.* ¶¶ 4–6.)  For all agreements, Greenlight Re was the reinsurance company, and AUI was the managing general agent.  (*Id.* ¶¶ 4–6, 8.)  The first agreement was effective July 1, 2008 (2008 Reinsurance Agreement) (Pl.'s Ex. 1, Dkt. No. 33-1), the second was effective July 1, 2010 (2010 Reinsurance Agreement) (Pl.'s Ex. 2, Dkt. No. 33-2), and the third was also effective July 1, 2010 (California Reinsurance Agreement) (Pl.'s Ex. 3, Dkt. No. 33-3).  (Defs.' 56.1 Stmt. ¶¶ 4–6.)  Each agreement was effective for one-year periods spanning July 1 to June 30, an "agreement year."  (2008 Reinsurance Agreement § 8.06(g); 2010 & California Reinsurance Agreements § 8.06(h).)  The agreements allow AUI to take a provisional commission of all ceded premiums, on a temporary basis, throughout each agreement year.  (Defs.' 56.1 Stmt. ¶ 11.)  AUI then has an adjustment period following each agreement year, during which AUI must calculate the adjusted commission for that year, based on the performance of the underlying

insurance policies,[1] and report its calculation to Greenlight Re.  (2008 Reinsurance Agreement §§ 8.06(c), 8.06(d); 2010 & California Reinsurance Agreements §§ 8.06(d), 8.06(e).)  If the adjusted commission is less than the provisional commission AUI kept during the agreement year, AUI is required to pay the excess money it kept to Greenlight Re "with its report."  (2008 Reinsurance Agreement §§ 8.06(c), 8.06(d); 2010 & California Reinsurance Agreements §§ 8.06(d), 8.06(e).)  Greenlight Re claims, and Defendants dispute, that AUI owes an aggregate $16,986,156 under the Reinsurance Agreements.

### B.      Retrocession Agreements

The second type of agreement is a retrocession agreement.  A retrocession agreement is like a secondary reinsurance agreement: the reinsurance company shares its own risk exposure with another company.  The company accepting some of the risk does so by posting collateral—giving the primary reinsurer money—to cover a portion of its anticipated losses over a given period of time.  (Barry Decl. ¶ 31, Dkt. No. 33; Defs.' Opp at 4, Dkt. No. 40.)  The amount of collateral that must be posted varies depending on the reinsurer's anticipated losses under reinsurance agreements.  (Barry Decl. ¶ 53; Defs.' Opp. at 4.)

There are two retrocession agreements at issue in this case.  The first agreement was effective July 1, 2008 (2008 Retrocession Agreement) (Pl.'s Ex. 5, Dkt. No. 33-5), and the second was effective July 1, 2010 (2010 Retrocession Agreement) (Pl.'s Ex. 6, Dkt. No. 33-6).  (Defs.' 56.1 Stmt. ¶¶ 27–28.)  Greenlight Re and App Re are the parties to both Retrocession Agreements.  (*Id.*)  Greenlight Re claims, and Defendants dispute, that the Retrocession

---

[1] The adjusted commission varies for two different "lines of business," or groups of policies, under the 2010 and California Reinsurance Agreements.  (§ 8.05.)   The adjusted commission may also be affected by the previous agreement year's premiums, or premiums in a different line of business, because the agreements allow for losses to be "carried across" lines of business or "carried forward" to the next agreement year under certain circumstances.  (§ 8.06.)

Agreements require App Re to post collateral to cover a portion of Greenlight Re's projected

losses under the Reinsurance Agreements.  (*Id.* ¶¶ 31–32.)  Defendants also dispute Greenlight

Re's claim that App Re owes an aggregate of $29,775,690 under the Retrocession Agreements.

(*Id.* ¶ 43.)

Because Greenlight Re and App Re disagreed over the amount of collateral App Re was

required to post under the Retrocession Agreements, Greenlight Re initiated arbitration in

November 2012.  (Defs.' 56.1 Stmt. ¶ 33.)  The arbitration panel ultimately awarded Greenlight

Re $24,456,213 in collateral due under the Retrocession Agreements and $460,354 in costs.

(Pl's Ex. 11 (Arbitration Award), Dkt. No. 33-11.)[2]

**C.      Guarantees**

The final type of agreement is a guarantee.  A guarantee is a promise to pay the debt of

another.  Greenlight Re claims, and Defendants dispute, that both Defendants guaranteed AUI's

debt under the Reinsurance Agreements and App Re's debt under the Retrocession Agreements.

(*Id.* ¶¶ 46, 55, 57–69.)  The first purported guarantee is a letter labeled "Parental Guarantee,"

printed on ISG letterhead, promising that AUI and ISG will keep App Re solvent, thereby

ensuring that App Re will be able to meet its obligations under the Retrocession Agreements.

(Pl.'s Ex. 14 (Parental Guarantee), Dkt. No. 33-14.)  The letter is signed, but there is no printed

name under the signature; Defendants dispute that the letter was executed by an agent of AUI or

ISG.  (Defs.' 56.1 Stmt. ¶¶ 46, 48–50.)  The second guarantee was executed in 2009 by William

M. Arowood as Vice President of AUI and President of ISG.  (Pl.'s Ex. 15 (2009 Guarantee) at

18, Dkt. No. 33-15.)  By this agreement, Defendants guaranteed "full and prompt payment . . . as

---

[2] Defendants deny that the panel issued a "proper" award because "the panel was [not] properly
comprised and [] [no] decision by the improperly constituted panel is valid."  (Defs.' 56.1 Stmt. ¶
34.)

and when the same becomes due . . . strictly in accordance with the . . . Relevant Contracts,"
"absolutely, unconditionally and irrevocably[,] . . . as primary obligors and not merely as
sureties."  (2009 Guarantee §§ 2(a), 2(a)(ii).)  Defendants also agreed that they would not permit
themselves or their affiliates to breach any Relevant Contract.  (2009 Guarantee § 10(a).)
Greenlight Re claims, and Defendants dispute, that the Reinsurance and Retrocession
Agreements are "Relevant Contracts" covered by the 2009 Guarantee.

Greenlight Re claims that Defendants have breached the Parental Guarantee and the 2009
Guarantee by refusing to pay debts owing under the Reinsurance and Retrocession Agreements.
Greenlight Re seeks to enforce the guarantees against Defendants, and also seeks damages for
violation of the 2009 Guarantee's covenant not to permit breach of the agreements.  Greenlight
Re also seeks an accounting and a declaratory judgment that Defendants must satisfy present and
future debts owing under the agreements.

## II.     Discussion

### A.     Legal Standard

Summary judgment is proper when "there is no genuine dispute as to any material fact
and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  A fact is material
if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 248 (1986), and a dispute is genuine if, considering the record as a whole, a
rational jury could find in favor of the non-moving party, *Ricci v. DeStefano*, 557 U.S. 557, 586
(2009) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

On a motion for summary judgment, the party bearing the burden of proof at trial must
come forward with evidence on each element of its claim or defense illustrating its entitlement to
relief.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  It cannot rely upon mere

"conclusory statements, conjecture, or speculation" to meet its burden. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted). If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts creating a genuine issue for trial, *i.e.*, evidence creating a factual issue about which reasonable minds could disagree. Fed. R. Civ. P. 56(f); *Anderson*, 447 U.S. at 250–51. The facts must be truly specific—it is not enough to speculate or to "vaguely assert[] the existence of some unspecified disputed material facts." *Aetna Cas. & Surety Co.*, 404 F.3d 566, 574 (2d Cir. 2005) (citing *W. World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1980)). The court should view all evidence "in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor," and a motion for summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citations and quotations omitted).

**B.      Breach of Guarantees**

Greenlight Re's first claim is that both Defendants have guaranteed payments of two debts, and both Defendants have breached those guarantees. The parties do not contest that the guarantees of payment are subject to New York law. A plaintiff seeking to enforce a guarantee of payment under New York law must show that a third party owes the plaintiff a debt, the defendant guaranteed payment of that debt, and the debt has not been paid by the third party or the defendant. *Donjon Marine Co. v. Water Quality Ins. Syndicate*, 523 Fed. App'x 738, 741 (2d Cir. 2013) (citing *Chem. Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir. 1994)); *HSH Nordbank AG N.Y. Branch v. Street*, 421 Fed. App'x 70, 72 (2d Cir. 2011) ("[W]here . . . a creditor seeks summary judgment upon a written guaranty, the creditor need prove no more than an absolute

and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guarantee.").

### 1.     Debt Owed by Third Party

The first question is whether a third party owes Greenlight Re a debt.  Greenlight Re has produced evidence of two different outstanding debts: debt AUI owes under the Reinsurance Agreements, and debt App Re owes under the Retrocession Agreements.

### a.     Debt Owed Under Reinsurance Agreements

The unambiguous terms of the Reinsurance Agreements, together with data filed by Greenlight Re, are sufficient to establish that AUI owes a debt under the agreements.  As discussed above, the Reinsurance Agreements give AUI an adjustment period following each agreement year to calculate the adjusted commission for that year and report its calculation to Greenlight Re.  (Ex. 1 §§ 8.06(c), 8.06(d); Exs. 2 & 3 §§ 8.06(d), 8.06(e).)  If the adjusted commission is less than the provisional commission AUI kept during the previous year, AUI is required to pay the excess money it has kept to Greenlight Re "with its report."  (*Id.*)  In other words, AUI owed a debt to Greenlight Re once AUI reported an adjusted commission that was less than the provisional commission it had retained.

Defendants dispute the amount of debt owed under the Reinsurance Agreements.  Greenlight Re has produced evidence demonstrating that AUI owes $16,986,156.  Brendan Barry, the Chief Underwriting Officer for Greenlight Re, and Matthew Grunewald, a Deputy Underwriter for Greenlight Re, signed declarations explaining how this figure was calculated in accordance with the terms of the Reinsurance Agreements and AUI's own data.  Because Defendants have not identified any specific facts that raise a genuine dispute about these calculations, the calculations are essentially undisputed, and the Court need not repeat the entire

process here.  The broad strokes of the calculation are as follows.  During each agreement year, AUI retained a percentage of Greenlight Re's ceded premiums as a provisional commission. (Grunewald Decl. ¶ 5, Dkt. No. 34.)  During the adjustment period following each agreement year, AUI calculated how much money it should have retained, which depends on a contractually defined ratio between losses Greenlight Re incurred to premiums it earned (the ultimate loss ratio).  (*Id.* ¶¶ 6–10.)  If the ultimate loss ratio is above a certain level, AUI is entitled to only its minimum commission.  (Reinsurance Agreements § 8.06.)  According to the data attached to Grunewald's declaration—data that Greenlight Re claims AUI provided—the ultimate loss ratio was so high during each agreement year that AUI was entitled to nothing more than its minimum commission.  (Grunewald Decl. ¶¶ 15, 27; Pl.'s Ex. 16 (June 2013 Borderaux), Dkt. No. 34-1.) But the data indicate that AUI provisionally retained more than its minimum commission for each of the agreement years.  (Grunewald Decl. ¶ 27; June 2013 Borderaux at 10.)  Altogether, the excess commission payments that AUI retained amount to $16,986,156.  (Grunewald Decl. ¶ 27; June 2013 Borderaux at 10.)

Defendants have not set forth any specific facts showing that there is a genuine dispute with respect to Grunewald's calculations.  They deny that AUI was entitled to only its minimum commission under the Reinsurance Agreements.  (Defs' 56.1 Stmt. ¶ 14.)  In support of this denial, Defendants cite five paragraphs (¶¶ 4, 5, 8, 9, 12) in the declaration of AUI's current president, Robert M. Arowood.  These paragraphs do not mention any factual basis for disputing this simple syllogism: AUI is entitled to only the minimum commission when the ultimate loss ratio rises above a certain level.  The ultimate loss ratio was above that level during all agreement years.  Therefore, AUI is entitled to only the minimum commission for each agreement year.  Arowood describes negotiations between the parties regarding payment when

commission rates changed (¶ 4), asserts that it is a "complex mathematical exercise" to estimate how much commission rates will change (¶ 5), makes a hearsay statement about a calculation by AUI and App Re's actuaries in the third quarter of 2012 (¶ 8), claims that he has asked Greenlight Re for an explanation of their calculation of the ultimate loss ratio (¶ 9), and discusses the Retrocession Agreements, which are irrelevant to this question (¶ 12.)  But Arowood does not cite any facts or documents to support another version of how AUI's commission should be calculated.  He does not refer to any specific fact that creates an issue about the plain language of the Reinsurance Agreements, which limit AUI to its minimum commission "if the Ultimate Loss Ratio . . . is 61% or greater."  (2010 & California Reinsurance Agreements § 8.06(a)(ii); *see* 2008 Reinsurance Agreement § 8.06(a)(i) (similar provision).)  Nor does Arowood mention any specific fact suggesting that, contrary to Grunewald's calculation, the ultimate loss ratio was less than 61% during any agreement year.[3]

Defendants also deny that the difference between the provisional commission AUI retained and the commission AUI actually earned was $16,986,516.  (Defs.' 56.1 Stmt. ¶ 22.) Again, they cite five paragraphs of Arowood's declaration in support of this denial (¶¶ 8, 9, 10, 11, 14).  These paragraphs do not describe any particular way in which Grunewald's calculation is flawed.  Arowood suggests that Defendants' actuaries disagreed with Greenlight Re about the portion of the ultimate loss ratio attributable to a certain class of claims—but he does not describe the impact this disagreement would have on Grunewald's calculation (nor does he attach any evidence of the actuaries' analyses).  Moreover, these paragraphs of Arowood's

---

[3] Defendants deny that the June 2013 Borderaux is an accurate copy of the Borderaux that AUI supplied to Greenlight Re.  (Defs.' 56.1 Stmt. ¶ 19.)  This fact is immaterial.  The material question is whether the data in this version of the Borderaux are correct, and Defendants have not cited any specific fact to suggest otherwise.

declaration describe the completeness of data as of the third quarter of 2012—but Grunewald's calculation is based on data as of June 30, 2013.  (June 2013 Borderaux.)

In sum, Defendants have not identified any specific facts that raise a genuine dispute about the accuracy of Grunewald's calculation of debt AUI owes under the Reinsurance Agreements.

### b.      Debt Owed Under Retrocession Agreements

Likewise, the unambiguous terms of the Retrocession Agreements, together with data filed by Greenlight Re, indicate that App Re owes debt to Greenlight Re.  The Retrocession Agreements require App Re to pay collateral to Greenlight Re once the incurred net loss ratio on Greenlight Re's books is greater than 60%.  (2008 Retrocession Agreement Art. 9; 2010 Retrocession Agreement Art. 8.)  The amount of collateral that App Re must pay is a percentage of the projected ceded premiums to Greenlight Re; the higher the incurred net loss ratio, the higher the percentage of the projected ceded premium App Re must pay.  (*Id.*)  Again, because Defendants have not identified any specific fact undermining Barry and Grunewald's calculations, the Court does not rehash those calculations here.  Suffice it to say that, based on the data in Exhibit 17 to Grunewald's Declaration, Grunewald calculated that App Re owes Greenlight Re almost $30 million in collateral under the Retrocession Agreements.  The parties agree that $5,100,000 of collateral has already been posted; therefore, App Re owes Greenlight Re no less than $24,456,213 under the Retrocession Agreements.  (Grunewald Decl. ¶¶ 28–33 & Ex. 17, Dkt. No. 34-2.)  This evidence is bolstered by the fact that an arbitration panel ruled that App Re owed Greenlight Re $24,456,213 under the Retrocession Agreements as of August 15, 2013.  *Accord Clarendon Nat. Ins. Co. v. Transamerica Ins. Co.*, No. 92 Civ. 1483 (LMM), 1992

WL 122781, *1 (S.D.N.Y. May 22, 1992) ("[T]he result of the arbitration will in all probability be of substantial assistance to the Court . . . .").

Defendants dispute the method for calculating App Re's collateral obligations as well as the amount of collateral that remains to be paid. But again, as with the Reinsurance Agreements, Defendants have not identified any specific facts to support their dispute. Defendants deny that the formula for determining the amount of collateral that AUI must post is set forth in each Retrocession Agreement. (Defs.' 56.1 Stmt. ¶ 37.) They rely on five paragraphs of Arowood's declaration to support their claim that "the Retrocession Agreement [sic] only describe conditions that must exist for collateral to be posted." (*Id.* (citing Arowood Decl. ¶¶ 5–9.).) These paragraphs do not mention any specific reason to dispute the terms of the Retrocession Agreements, which clearly state that App Re "shall provide" collateral when the incurred net loss ratio rises above 60%. (2008 Retrocession Agreement Art. 9; 2010 Retrocession Agreement Art. 8.) The paragraphs do not even discuss whether the conditions in the Retrocession Agreements are necessary or sufficient to trigger App Re's duty to post collateral. Instead, these paragraphs set forth a general background description of the Reinsurance Agreements (Arowood Decl. ¶¶ 5–7) and discuss calculation of the ultimate loss ratio under the Reinsurance Agreements (*id.* ¶¶ 8–9). There is no specific fact in these paragraphs that raises a genuine issue about whether the Retrocession Agreements set forth the formula for determining the App Re's obligation to post collateral.

The same holds true for many other facts about the Retrocession Agreements that Defendants dispute. Defendants cite the same five paragraphs of Arowood's declaration, paragraphs five through nine, to support their denial of the following facts:

- App Re agreed to accept Greenlight Re's calculation of the incurred net loss ratio (Defs.' 56.1 Stmt. ¶ 39)

- Greenlight Re's Exhibit 17 sets forth Greenlight Re's calculation of the incurred net loss ratio and the ceded net written premiums for each agreement year (*id.* ¶¶ 40–41)

- AUI provided Greenlight Re with the summary figures for ceded net written premiums set forth in Greenlight Re's Exhibit 17 (*id.* ¶ 42)

- Grunewald's calculation of App Re's collateral obligations is correct (*id.* ¶¶ 43–44)

- Greenlight Re properly demanded that App Re post its collateral, but neither App Re nor any other party has done so (*id.* ¶ 45)

Paragraphs five through nine of Arowood's declaration do not mention any specific reason to dispute any of these assertions, which are supported by Greenlight Re's evidence cited in its 56.1 Statement.   (Pl.'s 56.1 Stmt. ¶¶ 39–45, Dkt. No. 36.)

Finally, with regard to the debt under both the Reinsurance and the Retrocession Agreements, Defendants claim that the debt is not owed because "there has not yet been a finding of liability under the Reinsurance Agreements and Retrocession Agreements."  (Defs.' Opp. at 15, Dkt. No. 40.)  But neither set of agreements requires a "finding of liability" before payment.  The agreements require payment when certain conditions obtain; as discussed above, those conditions have obtained, and payment is due.  In a recent case in which the defendant guarantor made a similar argument, the Second Circuit held that "[b]y its terms, the [] Agreement does not require arbitration before payment; it requires payment upon completion of [plaintiff's] work," and, because the work had been completed, payment was due.  *Donjon*, 523

Fed. App'x at 742.[4]  The same is true here.  The conditions to payment in each agreement have

been satisfied.  For this reason, Defendants' reliance on *Halfmoon Prof'l Offices v. Am. Title Ins.*

*Co.*, 652 N.Y.S.2d 390 (3d Dep't 1997), is misplaced.  The underlying agreements in that case

specified conditions to payment that had not yet been met.[5]  *Id.* at 392 (holding plaintiff had not

satisfied insurance policy's preconditions to damages).

For the foregoing reasons, Greenlight Re has established that AUI owes a debt of

$16,986,516 under the Reinsurance Agreements, and App Re owes $24,456,213 under the

Retrocession Agreements.  Defendants have not identified any specific fact that raises a genuine

issue about the accuracy of these figures.

### 2.    Guarantees of Debt Owed by Third Party

The second question is whether Defendants guaranteed payment of these debts.  A

guarantee of payment is absolute and unconditional: it is an agreement that the creditor may seek

---

[4] Defendants cite *In re Same Time Holdings Ltd.*, 12 Misc. 3d 1186(A) (N.Y. Sup. Ct., N.Y. Cnty. 2006), as authority supporting the proposition that there must be a final determination of liability before a debt is owed.  The plaintiffs in *Same Time* had moved to stay arbitration, and defendants opposed the motion under the Federal Arbitration Act.  Defendants in this case have not moved to compel arbitration under the Federal Arbitration Act.  Even if they had, it is unclear whether the arbitration clauses in the underlying agreements would capture disputes arising out of the guarantees.  The Reinsurance Agreements require arbitration of "any dispute . . . arising between [State National Insurance Company] and [Greenlight Re] . . . with respect to these Parties' obligations hereunder."  (Reinsurance Agreements § 10.01.)  The Retrocession Agreements require arbitration of "[a]ny . . . matter in question between [Greenlight Re] and [AUI] . . . relating to . . . the interpretation . . . of this Agreement . . . ."  (Retrocession Agreements Art. 11.)  These clauses are limited to disputes between the parties to the contract. By contrast, in *Same Time*, the Court compelled the parties to arbitrate disputes arising out of a guarantee because the underlying contract required arbitration of "all disputes arising in connection with this Agreement."  *Id.* at *1.

[5] And in *Marosu Realty Corp. v. Cmty. Preservation Corp.*, 26 A.D.3d 74, 81 (1st Dep't 2005), which did not involve any sort of guarantee, the plaintiff's failure to meet preconditions *triggered* its indebtedness.  That case is completely off-point.

payment from the guarantor first, before asking the primary debtor for a penny.  *Donjon*, 523 Fed. App'x at 742 (citing *Thomas H. Lee Equity Fund V, L.P. v. Bennett*, No. 05 Civ. 9608 (GEL), 2007 WL 950133, *3 (S.D.N.Y. Mar. 28, 2007) (Lynch, J.)).  The 2009 Guarantee is a guarantee of payment that applies to the Reinsurance and Retrocession Agreements; however, the Parental Guarantee is not.

### a.    Parental Guarantee

At the motion to dismiss stage, this Court held that the Parental Guarantee appeared to be a guarantee of payment.  Upon further consideration and review of the parties' briefs and exhibits, it is now apparent that the Parental Guarantee does not guarantee payment to Greenlight Re for debt owed under the Reinsurance or Retrocession Agreements.  It does not guarantee payment to Greenlight Re at all.  Instead, the Parental Guarantee promises to fund "various ISG group of companies [sic], which transact reinsurance and retrocessional business with Greenlight [Re] . . . to ensure the companies are at all times fully funded and particularly able to meet all its [sic] obligations to [Greenlight Re]."  ISG promised to keep other companies solvent.  It did not promise to pay the companies' debt for them.  While Greenlight Re may be able to enforce this agreement against ISG, require ISG to pay money to other companies, and then collect payment from other companies, Greenlight Re has not sought such relief here.  Instead, Greenlight Re has filed a claim for breach of a guarantee.  Greenlight Re has failed to demonstrate that the Parental Guarantee is a guarantee of payment.

### b.    2009 Guarantee

The 2009 Guarantee was executed by Arowood on behalf of Defendants AUI and ISG. (2009 Guarantee at 18.)  By this agreement, Defendants guaranteed "full and prompt payment. . . as and when the same becomes due . . . strictly in accordance with the . . . Contracts,"

14

"absolutely, unconditionally and irrevocably[,] . . . as primary obligors and not merely as sureties."  (2009 Guarantee §§ 2(a), 2(a)(ii).)  This is clearly an absolute and unconditional guarantee.

There is a further question whether the Reinsurance and Retrocession Agreements are "Relevant Contracts" covered by the 2009 Guarantee.  Relevant Contracts are listed in Exhibit B to the 2009 Guarantee.  (§ 10(m).)  At the time the parties executed the 2009 Guarantee, Exhibit B listed what appear to be references to the 2008 Reinsurance Agreement ("2008 – State National Quota for Appalachian Underwriters Inc.") and the 2008 Retrocession Agreement ("2008 – Quota Share Agreement").  Three of the agreements at issue—the 2010 Reinsurance Agreement, the 2010 California Reinsurance Agreement, and the 2010 Retrocession Agreement—do not appear in Exhibit B because they were executed after the 2009 Guarantee. The 2009 Guarantee does specify, however, that "[a]ny contract between any Guarantor Affiliate and [Greenlight Re] shall automatically, as a condition precedent to entering into the contract, be added as a Relevant Contract to Exhibit B."  (*Id.* § 10(m).)  And the 2009 Guarantee identifies App Re as a "Guarantor Affiliate."  (*Id.* at 1.)  Therefore, because App Re and Greenlight Re were parties to each of the three 2010 agreements, the three 2010 agreements were automatically added to Exhibit B as "Relevant Contracts."

Defendants dispute the foregoing analysis.  First, they argue that, because payment was promised "strictly in accordance with the . . . Relevant Contracts," Greenlight Re must take the primary debtors to arbitration and obtain an arbitration award before Defendants' liability is

triggered under the 2009 Guarantee.[6]  This argument makes little sense.  A guarantee of

collection requires the creditor to pursue legal proceedings against the primary debtor before

attempting to collect payment from the guarantor; a guarantee of payment, which is made using

terms such as "absolute" and "unconditional," does not require any legal proceedings between

the primary debtor and the creditor as a condition to seeking payment from the guarantor.

*Thomas H. Lee Equity Fund*, 2007 WL 950133, at *3.  A guarantee of payment is, as it says, an

unconditional promise to pay the debt as it becomes due.  Requiring Greenlight Re to arbitrate

with the primary debtor before seeking payment would treat this guarantee as a guarantee of

collection—but the plain language of the guarantee indicates that it is a guarantee of payment.

An arbitration clause in the underlying agreement does not change an otherwise clear guarantee

of payment into a guarantee of collection.  *Accord Donjon*, 523 Fed. App'x at 742 ("There is no

basis for us to conclude . . . that by agreeing to pay 'in accordance with the terms of the' []

Agreement, [the guarantor] implicitly conditioned payment on [the creditor's] successful

arbitration against [the primary debtor].").

Second, in some sections of their papers, Defendants dispute that the 2009 Guarantee

covers debt under the Reinsurance and Retrocession Agreements.  (Defs.' 56.1 Stmt. ¶¶ 55–56,

61, 66–69.)  But in other sections of their papers, Defendants concede that the 2009 Guarantee

does cover the agreements.  (Defs.' 56.1 Stmt. ¶¶ 54, 62–63, 94–98; Defs.' Opp. at 7–8.)  At any

rate, Defendants have not identified any specific fact that raises a genuine issue about whether

the agreements are covered by the 2009 Guarantee.

---

[6] Defendants cite paragraph 39 of Arowood's declaration in support of this argument.  In relevant
part, that paragraph states only that "the dispute resolution mechanisms for disputes must be
followed before Greenlight can request remedies under the 2009 Guarantee."  Arowood merely
restates Defendants' legal argument without identifying any specific fact to support that
argument.

Finally, Defendants argue that the 2009 Guarantee is "no longer in effect" because the obligations arising under a promissory note and a reinsurance agreement, both of which are covered by the 2009 Guarantee, have been paid in full.  (Defs.' Opp. at 7–8, 12.)  In support of this claim, Defendants cite paragraph 39 of Arowood's declaration, in which he asserts that obligations under the same promissory note and reinsurance agreement have been fully satisfied. These facts are immaterial.  The 2009 Guarantee covers many other agreements.  By its terms, the guarantee remains in effect until "all . . . Guaranteed Obligations have been paid in full." (2009 Guarantee § 1(a) (defining "Termination Date").)  Obligations under the Reinsurance and Retrocession Agreements are covered by the 2009 Guarantee, and they have not been paid in full.  Therefore, the 2009 Guarantee is still in effect.  Defendants have not cited any specific fact creating a genuine issue about this point.

In sum, by the 2009 Guarantee, Defendants have guaranteed payment of debt under the Reinsurance and Retrocession Agreements.

### 3.    Payment of Debt Owed by Third Party

The final question is whether these debts have been paid by Defendants or the primary debtors.  Plaintiffs have produced evidence that both debts are unpaid.  (Barry Decl. ¶ 28 (Reinsurance Agreements), ¶¶ 32–34, 57 (Retrocession Agreements).)  Defendants raise two disputes about this evidence, neither of which is meritorious.

First, Defendants claim that AUI paid Greenlight Re $5.1 million under the Reinsurance Agreements, and Greenlight Re's calculation fails to take that payment into account.  In support of this claim, Defendants cite Arowood's declaration, which simply asserts that "Greenlight has not given any credit for this [$5.1 million] payment in its calculations."  (Arowood Decl. ¶ 13.) Of course, as discussed earlier, Greenlight has taken the $5.1 million payment into account.

(Grunewald Decl. ¶¶ 28–33 & Ex. 17, Dkt. No. 34-2.)  Arowood's mere denial of the $5.1 milllion credit is insufficient to create a genuine issue for trial.  *See* 10B Wright & Miller, Fed. Prac. & Proc. Civ. 3d § 2738.

Second, Greenlight Re's Statement of Material Facts asserts that Greenlight Re "demanded that App Re post this collateral [due under the Retrocession Agreements], but neither App Re, nor any other party has done so."  (Pl.'s 56.1 Stmt. ¶ 45, Dkt. No. 36.)  Defendants deny that "Greenlight Re has *properly* demanded that App Re post this collateral, but neither App Re, nor any other party has done so."  (Defs.' 56.1 Stmt. ¶ 45 (emphasis added).)  It is unclear whether Defendants intend to dispute whether the collateral has been posted, but even if Defendants do intend to dispute that point, they have not identified any specific facts to sustain such a dispute.  Defendants once again cite paragraphs five through nine of Arowood's Declaration, none of which suggest that the collateral has been posted.

Greenlight Re has therefore supported each element of its claim for breach of the 2009 Guarantee, and Defendants have failed to demonstrate that there is a genuine issue for trial.  The Court grants summary judgment in Greenlight Re's favor for breach of the 2009 Guarantee, but denies summary judgment for breach of the Parental Guarantee.

### C.    Declaratory Judgment

Greenlight Re seeks a declaration that "the Guarantees require the Defendants to satisfy App Re's present and future collateral obligations under the Retrocession Agreements and AUI's present and future commission adjustment payments under the Reinsurance Agreements." (Compl. at 14, Dkt. No. 1.)  For the foregoing reasons, Greenlight Re has demonstrated that the 2009 Guarantee requires Defendants to satisfy debts under the Retrocession and Reinsurance Agreements.  Defendants oppose entry of declaratory judgment on the same grounds that they

opposed summary judgment for breach of the 2009 Guarantee.  Because Defendants' arguments are not meritorious, the Court grants Greenlight Re's request for declaratory judgment with respect to the 2009 Guarantee.

### D. Breach of Contract

Finally, Greenlight Re seeks summary judgment on its claim that Defendants have breached Section 10(a) of the 2009 Guarantee.  To recover for breach of contract under New York law, a plaintiff must demonstrate the existence of a contract, performance by the plaintiff, breach by the defendant, and damages.  *Fischer & Mandell LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011).  Greenlight Re has produced evidence in support of each of these elements. There is no dispute that the 2009 Guarantee is a contract between Greenlight Re and Defendants.[7]  There is also no dispute that Greenlight Re has performed under the contract. Defendants do dispute, however, that they have breached Section 10(a).

Section 10(a) prohibits Guarantors from breaching any Relevant Contract or permitting a Guarantor Affiliate to do so.  As discussed above, Defendants are both Guarantors, App Re is a Guarantor Affiliate, and the Reinsurance and Retrocession Agreements are Relevant Contracts. (*See also* 2009 Guarantee at p. 1 (defining Guarantor and Guarantor Affiliate), § 10(m) (defining Relevant Contracts), § 13 (defining Guarantor and Guarantor Affiliate), p. 18 (listing Defendants as Guarantors).)  Therefore, Section 10(a) prohibits AUI from breaching the Reinsurance

---

[7] Defendants deny that they "executed a second guaranty (the '2009 Guaranty') on March 17, 2009."  (Defs.' 56.1 Stmt. ¶ 51.)  But this denial appears to be limited to the fact that the 2009 Guarantee was a "second" guarantee.  The paragraphs of Arowood's declaration cited in support of this denial discuss execution of the Parental Guarantee; in fact, Arowood claims that the Parental Guarantee, if it had been executed by Defendants, "would have been superseded by the 2009 Guarantee." (Arowood Decl. ¶ 33.)

Agreements, and it prohibits Defendants from permitting App Re to breach the Retrocession Agreements.

As implied by the discussion above, AUI has breached the Reinsurance Agreements. Under each agreement, if AUI's adjusted commission is less than its provisional commission, AUI must repay the excess provisional commission "with its [annual] report." (2008 Reinsurance Agreement §§ 8.06(c), 8.06(d); 2010 & California Reinsurance Agreements §§ 8.06(d), 8.06(e).) AUI's adjusted commission for each agreement year and each line of business was less than the provisional commission it had retained. (June 2013 Borderaux.) Yet when AUI reported its adjusted commission to Greenlight Re, AUI failed to repay the excess provisional commission it had retained. (Barry Decl. ¶ 28.) AUI's failure to repay the excess provisional commission it retained is a breach of the Reinsurance Agreements. By permitting AUI to breach the Reinsurance Agreements, Defendants breached Section 10(a) of the 2009 Guarantee. For the reasons discussed above, Defendants have failed to identify any specific fact creating a genuine dispute about this conclusion.

Likewise, App Re has breached the Retrocession Agreements. The Retrocession Agreements state that App Re "shall provide" collateral when the incurred net loss ratio rises above 60%. (2008 Retrocession Agreement Art. 9; 2010 Retrocession Agreement Art. 8.) The amount of collateral that App Re must provide varies depending on the net loss ratio. Greenlight Re has demonstrated that the ratio was above 60% for each agreement year; by Grunewald's calculations, App Re owes $29,775,689 in collateral. But App Re has paid only $5.1 million in collateral. Therefore, App Re has breached the Retrocession Agreements. By permitting App Re to breach the Retrocession Agreements, Defendants breached Section 10(a) of the 2009

Guarantee.  For the reasons discussed above, Defendants have failed to identify any specific fact creating a genuine dispute about this conclusion.

**III.    Conclusion**

Greenlight Re's motion for summary judgment is DENIED as to breach of the Parental Guarantee.  In all other respects, the motion for summary judgment is GRANTED.

Within the next two weeks, the parties shall confer about whether Greenlight Re wishes to withdraw its claim for breach of the parental guarantee.  If Greenlight Re does choose to withdraw that claim, the parties shall confer about a proposed judgment.  The joint proposed judgment—or separate proposed judgments, if the parties cannot agree—are due within two weeks.  If Greenlight Re does not choose to withdraw its claim for breach of the parental guarantee, it shall notify the Court by letter within two weeks.

The Clerk of Court is directed to close the motion at Docket Number 31.

SO ORDERED.

Dated: July 28, 2014
      New York, New York

_____
J. PAUL OETKEN
United States District Judge

21